And the first is number 19-2196. Kline v. Hampton Township Emergency Medical Services, Inc. Mr. Sansone and Mr. Bechtel. Oh, I'm sorry. I'm sorry. Is this Kline? Mr. Bechtel. Ms. Tuttle. Tuttle. I apologize, Your Honor. There was a substitution. Yeah, I have an order. I apologize. Just come up and give your name. Here it is. Elizabeth Tuttle. My fault. Yes, Your Honor. Thank you. I have the new one now. So, Ms. Tuttle and Mr. Bechtel. Thank you. Good morning, Your Honors, Counsel. May it please the Court, my name is Elizabeth Tuttle and I represent the appellants Gail and Chester Kline, Jr. May I reserve three minutes for rebuttal? Sure, ma'am. Thank you. Appellants come before you today to respectfully seek a reversal of the District Court's opinion. The lower court erred when it held that Gail Kline was not subjected to a hostile work environment, when it disregarded record evidence disputing the stated reasons for Gail Kline's termination, and when it held that Gail and Chester Kline, Jr. were not terminated in retaliation for their numerous complaints of sexual harassment. Let's get some facts out of the way if we can. How many times did Gail Kline see or overhear pornography being watched in her office? At least twice, Your Honor. And how many times did she overhear Jim, the brother-in-law, recalling her offensive names? At least once, Your Honor. Okay. However, to clarify, Your Honor, she was told more times than that by other individuals who work at Hampton EMS that he referred to her as those terms. And that evidence is in the record or? Yes, Your Honor. Okay. So regarding the hostile work environment. Had this gone on the whole time she'd been there, or was it a recent development? Your Honor, the record evidence shows that in the last year that Gail Kline was employed by Hampton EMS as the director was when the brunt of these things occurred. And there were six complaints made by either Gail Kline or Chester Kline, Jr. during the last nine months of their employment at Hampton EMS. So regarding the hostile work environment, Gail Kline was subjected to severe or pervasive sexual harassment when she was referred to as an FNC word on multiple occasions. I would say, you know, frankly, why don't we say fucking cunt? Because I find it extremely objectionable, offensive. And I think it demonstrates exactly what the atmosphere was. I agree, Your Honor. My clients found it to be extremely objectionable and extremely hurtful and, frankly, humiliating to be subjected to that kind of language. However, I didn't want to disrespect the court by using that term. Counsel, that's the appropriate approach that Judge Roth's comment is at. And we have held, have we not, that even the mere single utterance of an offensive term such as this could be sufficient to justify a hostile workplace claim. Yes, Your Honor. That is correct. There is a case law from this honorable court as well as district courts holding so. And over severe or pervasive, you can focus on severe. You don't necessarily have to have pervasive in order to prevail in a particular case. Correct, Your Honor. You only need it to be severe or pervasive. However, in this instance, my clients and myself would argue that this was both severe and pervasive and that the terms were so objectively offensive and that it happened on such a frequent occasion that this rises to a level of both severe and pervasive, even though that you don't need both. Now, you have three claims. Yes, Your Honor. It would appear that the third claim, the retaliation claim, I'm not sure what the protected activity is that what she made complaints. Yes, Your Honor. The protected retaliated for for making complaints. Yes, Your Honor. The protected activity alleged here in the record is that both Gail and Chester Cline, Jr. made complaints regarding the sexual harassment that Gail was being subjected to to the chairman of the board, Chester Cline, Sr., on multiple occasions, and that Gail and Chester Cline, Jr. were retaliated against when they were terminated a mere 10 days approximately after making their last complaint of sexual harassment. But the board members didn't even know about those complaints, did they? Well, Your Honor, there's actually some record evidence in the record at page 213 that. The other two board members who voted to terminate my clients may have been told about the complaints. However, even if that weren't so, that creates a disputed fact in the record. But even if that weren't the case, our opinion is that the board members were so influenced by Chester Cline, Sr., who held a disproportionate level of power on the board. And there's record evidence to the fact that he did hold that level of power and that whatever Chester Cline, Sr. wanted, Chester Cline, Sr. got. Additionally, the two board members who voted to terminate my clients were members of the Cline family. They were actually James Cline's wife and his sister, Tracy Cline and Nancy Peristock. So we think that that raises the inference that not only could these board members have known about these complaints, but that Chester Cline, Sr. used his influence to get the votes that he needed. Wasn't there also a significant family conflict involved in all of this? Your Honor, there was a significant family conflict involved in that my client, Gail Cline, was being sexually harassed at work and she had made complaints about that. And it didn't seem that Chester Cline, Sr., the chairman of the board, as well as her father-in-law, took the appropriate steps to address those issues. Well, in retaliation, doesn't it have to be a but-for clause? No, Your Honor. The standard for retaliation is that the plaintiffs have to show that they engaged in conduct protected by Title VII after or contemporaneous with engaging. A causal relationship, right? Yes, Your Honor. Protected activity leads to termination and retaliation for their protected activity. Yes, Your Honor. That is correct. And the causal connection here can be shown through either a temporal proximity or through a continuing pattern of antagonism. What about defiore versus CSL bearing? That's a retaliation claim in which Judge Fischer held that the standard... Looking for the... In contrast, the language of the second category of prohibited conduct employer retaliation on account of an employee having opposed complaint or sought remedies for discrimination contains no language specifying the lower standard of motivating factor. Well, Your Honor, I think the applicable standard is causation, that you have to have been engaged in a protected activity and there needs to be causation between your protected activity and the adverse action that you suffered here. We have all three of those elements. Isn't your stronger claims really the one for Title VII sex discrimination and the hostile work environment claim? I'm sorry, Your Honor. Could you repeat that? You have three claims. Yes, Your Honor. You have Title VII sex discrimination, hostile work environment, and retaliation. Aren't the first two significantly stronger than the third? Yes, Your Honor. I do believe that. However, the third count is not necessarily a throwaway count. I still believe that there is record evidence to show that my clients were retaliated against for engaging in protected activity. Speaking of the hostile work environment claim, the district court erred when it ignored conflicting evidence that clearly established that my clients alleged poor performance was a question of fact that was disputed by the parties. The district court erred when it held that the appellants failed to counter appellees' allegations of poor performance. There's record evidence in this case that James Klein testified that he never spoke with any individual holding a position of authority in Hampton EMS's management structure about potentially disciplining my client for her alleged poor job performance. And there's also record evidence that he did not at any time document any of Gail Klein's alleged performance deficiencies, despite the fact that there is record evidence that he documented many other things. Counsel, could we turn back for a moment to your disparate treatment claim? Yes, Your Honor. Walk us through the evidence of pretext. What is it that you alleged and then proved in the district court? Sure, Your Honor. So to show pretext, the plaintiff must point to some evidence, which is either direct or circumstantial, from which a fact finder could reasonably either So what was that? I'm sorry, Your Honor. So what was that? Sure. That was the fact that my client, Gail Klein, testified that she was never approached and told that she was doing a bad job at her job. There is evidence that James Klein testified to that fact, but my client testified that that never occurred. There is also evidence to show that the But there's also evidence that the employer thought that she was doing a bad job. And so if there is an honest belief by the board chair that your client was doing a bad job, does that still show pretext? Well, Your Honor, I think the other part of the pretext argument is the fact that Hampton EMS provided inconsistent reasons for my client's termination within one day of her being terminated. On the 23rd of April, Chester Klein Sr. indicated to my clients that they would be terminated. However, he did not provide them with a reason. Then on the 25th, when the board vote was held, the minutes show that the reasons for my client's termination, Gail Klein's termination, was that she had allegedly undermined James Klein's position and for alleged performance deficiencies. And then in the letter that was sent to my client on April 26th, a day after that, there was no mention made of her alleged performance deficiencies. So therefore, the lower court ignored inconsistencies provided by the employer for the unemployment or for the termination of my clients. Wasn't she having problems with billing procedures and ambulance and taxi procedures? Your Honor, there is no evidence that those alleged issues were ever brought to my client's attention, nor is there record evidence of those actually being problems. There is certainly evidence that James Klein testified to that fact, but there's also conflicting evidence in the record, which is why this should have been a fact question that went to a jury. OK, so is it your position that that in the first count discrimination that there are that there are issues of material fact? Yes, Your Honor. How about how about on the hostile work environment? Are there issues of material fact? Yes, Your Honor. And on the retaliation, are there issues of material fact? Yes, Your Honor. It's your position that we ought to send the case back to the district court for further proceedings? Yes, Your Honor, on all three counts. In this case, the district court disregarded multiple genuine material issues of fact. In finding back to Judge Mady's questions on the first claim. It seemed that Chester Senior believed that there was infighting that really had to be stopped. And but the board was told about the performance issues and the termination letter. Talk more about the infighting as opposed to the performance issues. So there is a problem there, but let's assume it's just one or the other. If there were infighting, significant infighting, such as the people really needed to be separated. Would that be enough reason to terminate her? Your Honor, I think this honorable court should look at the totality of the circumstances. I'm just saying that if there were infighting such that the combatants had to be separated, would that be enough reason to terminate her? Just I'm not asking you to agree to that. I'm just saying assume that that's. The hypothetical, if you want, in this case. Your Honor, I see that my time is up. You're on time. OK. Your Honor, while that in a workplace, certainly employers have the ability to terminate employees, especially in Pennsylvania, for any reason at all. In this case, Chester Klein, Sr. was aware of multiple multiple complaints that were made against James Klein, Jr. by both of my clients that jail that Gail Klein was facing sexual harassment at work. That sounds like retaliation. I'm going back to the first claim. You're saying sex discrimination. If. If the reason for the termination was because of infighting. Is that enough by itself to terminate her? In other words, your point is they gave one reason to the board and another reason in the termination letter. But let's assume it's just a start with. The the infighting, the nasty infighting, would that be enough to terminate her? Well, Your Honor, certainly an employer can make the employment decisions as long as they are not for an illegal reason. In this case, appellants contention is that this was made. What does the sex discrimination have to do with we need to separate the combatants? Well, Your Honor, I don't believe that this termination was presented as a let's separate these combatants. The termination was presented as. We believe, you know, James Klein over Gail Klein, despite all this other record.  So I'm trying to figure out on the first issue on on the title seven sex discrimination. How is. A Chester Klein's belief. I've got to get one of these people out of here. And she seems to be the one I'm going to suggest. Go. He doesn't tell the board that. But that's his reason. During his depositions, the primary reason I got to get them separated. How is that sex discrimination? It's sex discrimination. Discrimination in this case, because a female employee was treated differently than the male employee who was sexually harassing her at that time. That's only step one of the test, though, right? I mean, you still need to show that there was some pretextual motive beyond that. So I think we agree. We've satisfied steps one. Claim in the district court seems to agree that you've satisfied the first two steps of the burden. So I think where Judge Averill is focused and and I was earlier asking is what is the evidence at step three that says. That the board of directors chairman thought that this was what needed to be done to resolve the workplace tension. And I agree. The notice, as you say, is sort of functory. It just says we're taking this action. The letter that comes then to provides description. And it says, here's the things that have happened. You know, the company has found that unsatisfactory. It feels that it's inconsistent with your role and needs to therefore be resolved. Why is that not a legitimate exercise of authority? And what what is in the record to overcome that statement? What makes it pretext for your honors? The issue here is the fact that my clients provided Chester Klein Senior with multiple complaints regarding. Gail's the sexual harassment that she suffered while at work instead of investigating those matters. Chester Klein Senior only asked James Klein, did you do this? James Klein Junior responded, no. And that was the end of the matter. And in my opinion, and in my client's opinion, that should be enough to raise a question of fact as to whether or not the reasons provided by the Hampton EMS were, in fact, the legitimate stated reasons for my client's termination. And so if there were performance issues, which is what was presented to the board, but in by itself, how is that pretext? If your honor, because there are inconsistent reasons, certainly the performance issues were presented to the board. There's no dispute about that. But there was also other reasons that were alleged relating to my client's termination, including the performance issues, but also allegedly undermining James Klein's authority, even though my clients were actually above James Klein in the organization, according to an organizational chart that is in the record. There were also issues with interpersonal relationships between James and Chester Klein Junior that were alleged. But those were never brought up prior to this moment. Taking all of those things as a whole, the totality of the circumstances, raises a specter of doubt. Therefore, this should have gone to a jury. Thank you. That's a good segue to hear from you. Let me ask one more question. Go right ahead. Go right ahead. Excuse me. There obviously was family conflict going on. In such a situation, can sexual harassment, sexual discrimination be an element of the bad treatment that Gail Klein was receiving? If I'm understanding your question correctly, Your Honor, yes, I do think that is correct. But I would also point out that the district court, Hampton EMS, nor after a thorough review of case law in this circuit, could I find any case law that determines that if you were a family run business, you are not subject to the standards of Title seven. But how about a family run business in conflict? No, Your Honor, I don't believe that that that Title seven would would not apply to, you know, a family business would apply. But can you say that an element of the family conflict was sexual discrimination? Yes, Your Honor. OK. Thank you, Your Honor. I may have pleased to court, Your Honor, Robert Beck on behalf of Hampton Township EMS. We'll stick with the issue of pretext. The fact of the matter is the reasons for the termination were discussed the meeting as well documented. But to me, if her performance was deficient in terms of what she did on a day to day basis, why wasn't she informed of that in the termination letter? Your Honor, I think the performance was discussed as a smaller part of the termination. There's certainly evidence of record that her performance was an issue. It doesn't matter whether she was told that beforehand or not. All the members of the voting board were aware of her performance. Doesn't she have a right to know why she's really? I mean, if the board doesn't even know about the conflict. And they're told that she's not performing up to snuff so much so that she should be terminated. You would think when the board approved the motion to terminate her or they come to came to a consensus to terminate her. They would give her the reasons that were presented before the board. But in fact, they weren't. So it sounds. I mean, those are the types of things that lead one to a suspicion that there might be pretext here. Your Honor, the poor performance was discussed. But as well was discussed was the infighting, the undermining of Jim's authority. The board was well aware of that. What did the minutes show on that? It shows that Gail Klein and Chester Klein on more than one occasion undermined Jim's authority and overriding his decisions, personnel decisions on suspensions, which he had done before Gail was hired. He was told by the board when she took over that he would still have that rule. So they were undermining his authority. It was discussed at that meeting. It was causing infighting and dissension in the ranks. Employees were quitting because of it, talking about a tug of war between the Klein family. So is your argument that the poor performance was the interpersonal friction? No, my argument is it was twofold. Poor performance on Gail's part. See, the board had to make a decision. There was infighting that couldn't be fixed. And they couldn't run the business further with the current management structure in place. I think the question Judge Ambrose is raising is why does the letter that's sent not reflect that rationale? You're right in saying the employee doesn't have a right to any notice. They don't. But you have to show that there was no pretext here and respond to that allegation. And you're pointing to the letter, but the letter doesn't really answer. Well, I'm actually not pointing to the letter. I'm pointing about what was talked about at the meeting, and that's when the vote happened. And you can see at the meeting that both issues were discussed. And my point is. So why isn't it in the letter? Because I think the overarching theme, which is in the letter, is that there's fighting in the ranks, and we can't move forward under this current management structure. You're undermining Jim Klein's authority. It's boiled over to the point it almost got physical between Chad Klein Jr. and Jim Klein. So that's the overall theme of the letter. And I think the judge, or the court in the underlying court, was right when they said it's a small point that it didn't make its way into the letter. It, in fact, is well-documented. That was a reason. And all the board members that voted for that testified that those two reasons were the reason for termination. The district court here basically found that the discrepancies between the minutes and the termination letter were just a semantic difference. But isn't that, in effect, a finding of fact and a credibility determination that courts are not supposed to do at summary judgment? I don't think it's an issue of fact. The fact is, I think, I keep saying you have to look back at the board meeting. That's when the vote happened. And I think that's when you're looking for a pretext. You're looking at the minds of the decision makers. And both of those issues were discussed. And I believe, again, that the performance was a smaller part of that bigger picture. And that bigger picture made its way into the letter. But Gail says the performance was, excuse me, the performance problem was because Chester Jr. didn't train her properly. That's her testament, Your Honor. Right. And for, excuse me, this cold weather has me down. Isn't it a material issue of fact that has to be decided by a jury rather than by the judge? That was her, was her performance affected by the failure of Chester to properly train her? I don't, I don't believe so, Your Honor. I don't think she can say that she wasn't properly trained. And that's why her performance was poor. I don't think you look to the reason as to why her performance was poor. You look at the whether the reason that her performance was poor was the reason she was terminated. Well, if the reason her performance was poor was connected to Chester, who obviously in calling her a fucking cunt, had some discrimination problems, work environment problems. Was he failing to train her properly because he didn't want a woman in a supervisory position at the company? There's no evidence of record, Your Honor, of that. And her performance was poor. But there is, there is circumstantial evidence. There's testimony from Tracy Klein, one of the voting board members, that she had to do work that Gail was supposed to be performing. Because Gail says she wasn't properly trained. Because she just wasn't doing the work. Well, and she, well, that's not what Gail was saying. Gail was saying she wasn't properly trained. Gail was saying she wasn't properly trained. Don't you have to believe her at this point? Again, I think the issue is whether or not the voting members of the board believed her performance was poor. And the reason, it doesn't matter why her performance was poor. She could say it's for one reason. Jim could say it's for another. In fact, her performance was poor. And that's one of the reasons it was factored into the decision. It's a legitimate business decision, as is the reason to terminate them for undermining Jim's authority. The fact of the matter is the management structure couldn't work the way it was in place. So, you know, they had to make a decision. Do you let Chester, Jr., who's never there, go? And Gail, who has poor work performance? And who are undermining Jim's authority? Or Jim? But if Gail has poor work performance. Then tell her. Or has sexual discrimination, then isn't it part of that sexual discrimination to let her go because of that poor work performance? It has nothing to do with sex. I mean, it has to do with poor work performance. They have to show that the reason was perpetual. But at this point in the proceedings, you've got to believe her in summary judgment. And she's saying if I did the job poorly, it's because I was poorly trained by James, who was the one who was supposed to train her. Isn't that a material issue of fact that should have gone to the trier of fact? No, Your Honor. I think, again, I'm going to keep looping back to that decision about poor work performance. It's the mind of the decision makers, Nancy Perestock, Tracy Klein, and Chester, when they voted to terminate her. They all believe she had poor work performance. It's a legitimate business reason. It's a legitimate non-discriminatory reason. And there's no evidence of record. Well, is it a legitimate non-discriminatory reason if she was poorly trained by someone who was sexually discriminating against her? He was discriminating against her because of her sex. I think that raises a material issue of fact that's got to go to the trier of fact. I think the fact alone stands about the decision that's in the letter, that they were undermining Jim's authority and the company couldn't run. That's the bigger part of it. She was incorporated into that. Okay. I think you're asking us to make – I think you are trying to support the decision on issues of fact that the district judge made that he shouldn't have made. I disagree, Your Honor. The minutes focused almost exclusively on poor work performance, not the turmoil. I mean, where in the minutes do you think that there was significant discussion of the turmoil? It talks about undermining Jim's authority. It talks about Chester Kline, Jr. showing up at Chester Kline Senior's house, getting into a fight with Jim where he's flickering the trigger, almost boiled over to physical violence. It talks about people quitting, an overwhelming number of people quitting because of the turmoil. That's in the minutes. And that's reflected in a little more detail in the letter. The Gale, what did it say? She was a part of that in terms of – Well, the people quitting were quitting because of James Kline. For instance, John Koenig testified he quit because there was a tug of war between Gale and Jim and Chet. With Gale and Chet wanting things to happen one way and Jim wanting things to happen the other way. And he said it created a toxic work environment. That sounds like something that should be presented to a jury. Can we pick up on that reference to a toxic work environment and talk about the hostile workplace claim? The second claim. Yeah, what is it that you're – what is it that you're disagreeing with or how is it that you would support the district court's decision regarding the course of conduct that James engaged in, the use of the language, the consumption of explicit imagery, other evidence of minor disputes, locking out of cabinets and things like that? How do you see that not – how do you defend that along the district court's line of reasoning that none of this shows a hostile work environment? Well, I think we have to loop back to the first questions asked about the facts of the case. The pornography for one. The evidence of record is that there was one instance when Gale was in the presence of pornography and she was in her shared office with Jim. Jim was apparently showing something to some other fellow employees on his computer. She overheard it. She walked up, walked over to see what it was and saw pornography. But with the language that was used by Jim with respect to Gale plus the viewing of pornography. Chet Ambrose won't even say it. Not today. Actually, on that I'll tell you. I said to my clerks, I worked in a factory in the late 60s and there was a lot of offensive language, but if somebody used that, you would have gotten canned. And that's 50-some years ago. It's not done. And this is back in rural Ohio. So that kind of language would seem under Castleberry to be severe. It doesn't have to be pervasive, which is what you're focusing on. It would seem to be severe. And why should that not be evidence that can go to a jury of hostile work environment? Well, I think the court below looked at the totality of circumstances and that was one part of it, the offensive language. I think the court indicated that it was never used in her presence. Well, that doesn't make any difference. If he's poisoning the rest of the workforce, it doesn't make any difference if she doesn't hear it, except a few times. She's being told it's going on. But I think the case law supports the concept that the hostile work environment elements can be taking place outside of the presence of the plaintiff and still create a hostile work environment. I think Your Honor is correct that she didn't necessarily have to hear it, but then you have to factor in all the other conduct. And the other conduct here is... I think frankly calling, consistently calling the person who arguably has supervisory function over you a fucking cunt is in and of itself a hostile work environment. And when you reference counsel the other conduct, the other conduct includes the viewing of pornography on, I think, the testimony said so many occasions that they couldn't even count it. So how does the context of this help your case? Because it's what Gail saw and what Gail felt and whether it's severe and pervasive to her. Whether it was severe and pervasive to her. But she was unaware. The point is that the pornography happened one time in her presence and she asked Jim to turn it off and he shut it off. It happened twice in her presence. No, the other time, Your Honor, the evidence of record is that Jim was showing someone something on his cell phone outside of their office and she heard them talking about something... Well, I would say that was in her presence. ...that she thought might have been pornography, but she never confirmed if it was. She never saw it. She never heard anything. So she really only has one instance where she knows that she was being exposed to pornography. And she went over to see what it was, saw what it was, asked them to turn it off, and they turned it off immediately. You know, Judge Ross wrote an opinion called Mandel back in 2013, in which words like darling, woman, fluffy, missy, hun, toots, and bitch, which would be probably the most egregious, that was enough to get the case past summary judgment. The language used here seems to be far more than any of those words. Your Honor, there's another case, Baumgartner. It's 170F3D801. It's a Western edition case. It's instructed here. We're talking about Third Circuit cases. We're talking about Castleberry. Certain things can be severe. And we're talking about Mandel that says words far less than what were used here can get you to a jury, can cause a reversal of summary judgment in the employer's favor. Your Honor, I think there's a whole list of Third Circuit cases where you read through them at the bottom. You say, wow, I can't believe that wasn't found to be severe and pervasive. And this doesn't even scratch the surface, Your Honor. It doesn't scratch the surface. In your opinion. I think in my opinion, the opinion of the Third Circuit numerous times. Well, at this point, we're speaking for the Third Circuit. So I'm not sure I agree with you on that. And I think it's important. I understand that, you know, the words are severe, but she was never called this to her face. I think that is an important fact. But the point is not that you don't necessarily win, but that we don't and a district judge doesn't make the decision who wins or loses. The jurors do. I think this Court is within its power to look at the totality of circumstances, which is the record conduct, these seven different things that Jim reportedly did, and can make a decision that doesn't meet the threshold. It's a high burden, severe or pervasive, and it doesn't meet either problem. Have you considered the attitude that has been displayed by the bench today in this case in your chances of success on this appeal? And have you considered the possibility that mediation might be a better solution to this case? Your Honor, we've mediated once, but I'm still confident after today. I've been taking another look at this, that you will affirm the lower court's decision and see this for what it was. It was a family squabble that boiled over. They somehow made this family fight all the way up to the Third Circuit, which is unfortunate. The lower court solved for what it was and put the case to rest. They tried to rekindle it, and they would love for Your Honors to throw gasoline back on the fire, but Your Honors should see the case for what it is. There was no retaliation, no sexual harassment, no sexual discrimination in affirming the lower court's decision. You're a smart guy. You can read people, and you're seeing that there is a concern across the panel. And now are you as confident now as you were when you came in? I am, Your Honor. Really? Yes. Okay. We'll hear back from your opposing counsel then. Thank you, Your Honors. Your Honors, family businesses that are beset by family squabbles are still. I know attorneys in your position who would say simply, Your Honor, I have nothing further to say at this time. I will bow to the panel then in that case. It's your call, but the point is, is there anything else you really want to add? There's just one thing, and I won't belabor any points, but Your Honors were asking about pretext earlier, and you had gone back with Attorney Bechtol to go over some personnel decisions that my client, Gail, was allegedly undermining James Klein. I just want to point that there is record testimony in this case that James Klein testified that he was under the impression that he ran this organization, but there is also record testimony where he testified at his deposition that James, Gail, and Chester, Jr. were all supposed to make decisions together, yet he still made these decisions without my clients, and he got upset about that when they called him on it, even though he has his own testimony that they were supposed to make such decisions together. I think that would go to pretext, as we talked about before. So I cede the rest of my time. Thank you, Your Honors. Unless you have questions, of course. Okay. Thank you very much. Thank you. I would ask that counsel get together with the clerk's office afterwards and have a transcript compared to this whole argument.